IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** * | |
| * | **Criminal No. 16-00226-KD** |
| **v.** * | |
| * | |
| **RICHARD SNELLGROVE, M.D.** * | |

**MOTION REQUESTING A *DAUBERT* HEARING AND
MOTION IN LIMINE TO PRECLUDE CERTAIN PROPOSED EXPERT TESTIMONY**

Comes now the United States of America, by and through Richard W. Moore, the United States Attorney for the Southern District of Alabama, and files this combined motion requesting a *Daubert* hearing with regard to Dr. John McDuff, as well as a motion *in limine* to preclude certain proposed expert testimony.

### BACKGROUND

**A.    Overview of Transdermal Pharmaceutical Fentanyl Patches**

Fentanyl — the drug at the center of this case — is a Schedule II synthetic opioid analgesic. While in the same category as opioids like hydrocodone, oxycodone, and morphine, fentanyl is orders of magnitude more powerful.  As DEA Diversion Investigator Susanna Herkert testified in the trial of Dr. Ruan and Dr. Couch, "The subcutaneous, or the fentanyl that is given under the skin, is considered to be 50 to 100 times as potent as morphine." [Case No. 15-CR-00088-CG; Doc. No. 722-2, p. 11]   *See also*, *United States v. Thomas*, 489 F. App'x 688, 689 n.1 (4th Cir. 2012) (explaining that "[f]entanyl is a very powerful pain-relieving drug, about 50 to 100 times stronger than morphine, often prescribed to cancer patients"); *United States v. Wilmore*, 2017 U.S. Dist. LEXIS 166928, *10 n.28 (S.D.W.V. Oct. 10, 2017) (noting that "fentanyl is so potent that it is about fifty times stronger than heroin").  Simply put, fentanyl is one of the most powerful opioids allowed for use in humans.

1

Duragesic is a brand name "transdermal patch that delivers fentanyl, a Schedule II opioid pain medication, into the body slowly through the skin, where it works to relieve pain." *United States v. Ignasiak*, 667 F.3d 1217, 1222 n.8 (11th Cir. 2012). Each Duragesic patch is intended to release fentanyl at an hourly rate over the span of 72 hours. During the time period relevant to this case, Duragesic patches carried the following FDA warning concerning its indications and usage:

- DURAGESIC contains fentanyl, an opioid antagonist, and is indicated for the management of pain in opioid-tolerant patients, severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.

- Patients considered opioid-tolerant are those taking, for one week or longer, at least 60 mg oral morphine per day, 25 mcg transdermal fentanyl per hour, 30 mg oral oxycodone per day, 8 mg oral hydromorphone per day, 25 mg oral oxymorphone per day, 60 mg oral hydrocodone per day, or an equianalgesic dose of another opioid.

Limitations of use:
- Because of the risks of addiction, abuse, and misuse with opioids, even at recommended doses, and because of the greater risks of overdose and death with extended-release opioid formulation, reserve DURAGESIC for use in patients for whom alternative treatment options (*e.g.*, non-opioid analgesics or immediate-release opioids) are ineffective, not tolerated, or would otherwise inadequate to provide sufficient management of pain.

- DURAGESIC is not indicated as an as-needed (prn) analgesic.

See https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/019813s069lbl.pdf.

B.     **Overview of Duragesic Prescriptions Written for Matthew Roberts**

In the five months preceding his death, Matthew Roberts received — both directly and indirectly — *nine* month-long prescriptions for Duragesic patches from Dr. Snellgrove. One prescription for the 25-microgram per hour ("mcg/hr") strength, five prescriptions for the 50 mcg/hr strength, and three for the 75 mcg/hr strength. Of these nine prescriptions, seven were prescribed directly to Roberts, and two were prescribed in someone else's name for Roberts' use.

2

In addition, according to Robert's Blue Cross/Blue Shield Records, as well as Dr. Snellgrove's own medical records, only four of the nine Duragesic prescriptions were prescribed on a date these records indicate Roberts actually had an office visit.

Prior to receiving his first prescription for Duragesic patches on March 14, 2016, Roberts was taking only 40 mg of oral hydrocodone per day. Thus, he did not initially qualify as "opioid-tolerant" as that term is defined on the FDA Duragesic Warning Label. Furthermore, Dr. Snellgrove's medical records indicate that the reason he began prescribing Duragesic patches to Roberts was because "he is in the studio producing a new album and playing the guitar and his hand pain is increasing but he has to do the job."

On August 20, 2016, Matthew Roberts died of a drug overdose in the hallway of hotel in West Bend, Wisconsin. The Superseding Indictment alleges his death was caused by the fentanyl prescribed by Dr. Snellgrove. Two days prior to his death, Dr. Snellgrove wrote two Duragesic prescriptions for Roberts. Roberts filled the 75 mcg/hr Duragesic prescription on August 18, 2016, and a 75 mcg/hr patch was attached to his body at the time of his death.

### B. Procedural History

On October 26, 2016, defendant Dr. Richard Snellgrove was charged in a Superseding Indictment with prescribing controlled substances outside the usual course of professional practice, as well as healthcare fraud. [Doc. No. 37] Eleven of the thirteen counts charged in the Superseding Indictment relate to the prescribing of Duragesic patches — either directly or indirectly — to Matthew Roberts.[1]

On August 11, 2017, and then again on December 12, 2017, the United States provided defense counsel with summaries of the proposed opinion testimony of its expert witnesses. *See*

---

[1] Counts One and Two charge that Dr. Snellgrove with illegally prescribing hydrocodone and lorazepam in the name of someone else for Roberts' use.

3

[Doc. Nos. 33 and 46]  In response, defense counsel provided the United States with its proposed expert opinion summaries on January 24, 2018.  [Doc. No. 50]  Dr. Snellgrove intends to offer the testimony of: (1) Dr. John McDuff to opine on whether Dr. Snellgrove's Duragesic prescriptions to Matthew Roberts were written in the usual course of professional practice and for a legitimate medical purposes; (2) Chip Wells to opine on the toxicology labs; and (3) Dr. James Lauridson, M.D. to opine about the cause of Roberts' death.

The United States does not dispute that Mr. Wells has the requisite expertise to offer opinion testimony in the field of toxicology, nor that Dr. Lauridson qualifies as an expert forensic pathologist.  However, for the reasons set out below, the United States challenges Dr. McDuff's claimed expertise to offer opinion testimony regarding the Duragesic patches Dr. Snellgrove directly prescribed to Matthew Roberts.  Accordingly, the United States requests the Court set a *Daubert* hearing so his qualifications to offer the proposed expert testimony can be evaluated.

Finally, while the United States does not seek a *Daubert* hearing with regard to either Dr. Lauridson and Mr. Wells, some of their proposed opinion testimony should be excluded from trial for the reasons set out below.

## REQUEST FOR A *DAUBERT* HEARING

Prior to a witness being permitted to offer expert opinion testimony at trial, there are dual considerations that must be addressed.  The first consideration is whether the offering party has established that their witness has the requisite expertise to offer the proposed opinion testimony.  As the *en banc* Eleventh Circuit explained in its seminal case on the issue of expert testimony, the burden of establishing a proposed witness' expertise falls squarely on the offering party:

> The proponent of expert testimony always bears the burden to show that his expert is qualified to testify competently regarding the matters he intended to address: the methodology by which the expert reached his conclusions is sufficiently reliable; and the testimony assists the trier of fact.  The burden of establishing qualification,

>   reliability, and helpfulness rests on the proponent of the expert opinion, whether
>   the proponent is . . . the government or the accused in a criminal case.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).  This evaluation process is typically done via a *Daubert* hearing.[2]

The United States requests that the Court hold a pre-trial *Daubert* hearing to evaluate whether Dr. McDuff has the requisite expertise to opine on Dr. Snellgrove's prescribing of Duragesic fentanyl patches to Matthew Roberts.

According to the summary of his proposed testimony, Dr. McDuff intends to offer opinions regarding the seven counts in which Duragesic patches were prescribed directly to Matthew Roberts.  [Doc. No. 50]  These Duragesic prescriptions form the basis for the charges in Counts 3, 4, 7, 10, 11, 12, and 13 of the Superseding Indictment.  [Doc. No. 37]  For each of these charged instances, Dr. McDuff opines that the Duragesic patches were prescribed within the usual course of professional practice, *and* for a legitimate medical purposes.[3]

While the United States does not dispute that a medical doctor typically has a level of expertise in the practice of medicine, the relevant proposed opinions Dr. McDuff intends to offer are all specifically centered on one thing — the prescribing of Duragesic fentanyl patches.  Therein lies the problem.

---

[2]   A *Daubert* hearing is not always necessary to conduct this analysis, *see Frazier*, 387 F.3d at 1264, and district courts are granted "considerable leeway in the execution of its duty."  *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005).  However, the Eleventh Circuit has found that abdicating the gatekeeping role is an abuse of discretion.  *Id.* (citing *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005)).

[3]   The Controlled Substances Act provides an exception for medical practitioners with DEA licenses to prescribe certain Controlled Substances.  *See*  21 C.F.R. § 1306.04.   However, "to qualify for the exception, a defendant must have provided the prescription for *both* a legitimate medical purpose and while acting in the usual course of his profession.  Without both, the defendant is subject to prosecution."  *United States v. Dileo*, 625 F. App'x 464, 478 (11th Cir. 2015) (added emphasis), *accord United States v. Joseph*, 709 F.3d 1082, 1094 (11th Cir. 2013).

According to Alabama PDMP record,[4] Dr. McDuff has not written *any* prescriptions for fentanyl in the past five years, which encompasses the entirety of the relevant time period in this case. *See* Attachment A. Furthermore, the defense has produced nothing to support that Dr. McDuff has any expertise or specialized knowledge with regard to the prescribing of fentanyl that would set him apart as an actual expert on this topic.

Opinions offered by witnesses that are merely masqueraded as "expert" opinions should not be admitted under Rule 702. It is the defense's burden to establish that Dr. McDuff truly has expertise in a relevant area before he can offer opinion testimony labeled as "expert testimony." As the *en banc* Eleventh Circuit explained:

> The importance of *Daubert*'s gatekeeping requirement cannot be overstated. As the Supreme Court framed it in *Kumho Tire*: the objective of that requirement is to ensure the reliability and relevance of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. The district court's role is especially significant since the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it. Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay if the facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.
>
> \*   \*   \*
>
> We observe that experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status. . . . Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express. . . . [I]f a witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached,

---

[4] In 2004, the state of Alabama passed legislation requiring the creation of a state-wide electronic prescription drug monitoring program. CODE OF ALA. § 20-2-210. Thereafter, the Alabama Prescription Drug Monitoring Program ("PDMP") was created, and individuals authorized to dispense controlled substances were mandated to report certain information about these filled prescriptions to the Alabama PDMP. CODE OF ALA. § 20-2-213. Data from all Controlled Substance prescriptions filled within the state are compiled in the Alabama PDMP database.

> why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.

*Frazier*, 387 F.3d at 1260–61.

Finally, Dr. McDuff is a primary care/internist, whereas Dr. Snellgrove was a pain management practitioner during the relevant time period. *See* Attachment B. Thus, even if Dr. McDuff possesses expertise relevant to the field of primary care, the defense has not established how, or if, such expertise is relevant in evaluating the actions of a pain management practitioner.

Based on the information provided by defense counsel, it appears that Dr. McDuff is simply one of Dr. Snellgrove's colleagues who wants to help his friend by opining on Dr. Snellgrove's prescribing of Duragesic fentanyl patches to Matthew Roberts. Unless defense counsel establish that Dr. McDuff has the requisite expertise, he should be precluded from providing any of his proposed opinions during trial.

For the reasons set out in this section, the United States requests that a *Daubert* hearing be held with regard to Dr. McDuff, where the defense will have the burden of establishing what, if any, relevant expertise he possesses to support his proposed opinion testimony.

## MOTION *IN LIMINE* TO EXCLUDE CERTAIN PROPOSED TESTIMONY

As discussed above, the United States acknowledges that Mr. Walls and Dr. Lauridson possess the requisite expertise to offer opinion testimony in the fields of toxicology and forensic pathology, respectively. However, just because they qualify as experts, does not make all of their proposed expert testimony automatically admissible.

Even though a witness may qualify as an expert under Rule 702, there are rules governing the permissible scope of the testimony. For instance, expert witnesses are not permitted to opine about whether a defendant "did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." FED. R. EVID. 704(b). However, expert testimony

7

that leaves the inference for the jury to draw about a mental state or condition is permissible. *United States v. Steed*, 548 F.3d 961, 977 (11th Cir. 2008).

For ultimate issues not concerning a defendant's mental state or condition, an expert can give an opinion. FED. R. EVID. 704(a). However, there are limits to how far such opinion testimony can go. An expert cannot simply tell the jury what result to reach, because doing so is not helpful to the jury, and therefore, inadmissible. *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1989) (citing committee notes to FED. R. EVID. 704). Similarly, an expert witness "may not testify to the legal implications of conduct," because "the court must be the jury's only source of law." *Id.*

As always, the relevancy of proposed expert testimony is critically important to the determination of its admissibility. The Supreme Court made clear that Rule 702 "requires that the evidence or testimony assist the trier of fact to understand evidence or to determine a fact in issue. This condition goes primarily to relevancy. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 591 (1993) (internal citations and quotations omitted). Accordingly, even if a witness otherwise qualifies as an expert under Rule 702, expert testimony not relevant to the matters before the court is inadmissible.

Finally, the possibility of excluding otherwise admissible evidence under Rule 403 needs to be taken into particular account when examining expert testimony. As the *en banc* Eleventh Circuit explained:

> Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403. Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or needlessly time consuming. Indeed, the judge in weighing possible prejudice against probative force under Rule 403 exercises more control over

experts than over lay witnesses. Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.

*United States v. Frazier*, 387 F.3d 1244 at 1263 (11th Cir. 2004) (en banc) (internal citations and quotations omitted).

Based on this framework, the United States seeks to preclude the following opinion testimony:

### A. Dr. James McDuff — Internist and Primary Care Physician

As previously discussed, the United States contends that the defense has not carried its burden to establish what, if any, relevant expertise Dr. McDuff possesses regarding his proposed opinions about Dr. Snellgrove's prescribing of Duragesic fentanyl patches to Matthew Roberts. However, in the event that the defense does meet its burden, and the Court permits him to testify as an expert, the United States takes issue with the admissibility of some of his proposed testimony.

On March 14, 2016, Dr. Snellgrove prescribed Roberts a full-month supply of 50 mcg/hr Duragesic patches. (Count 3) This office visit and prescription is documented in the medical records. Three days later, Dr. Snellgrove prescribed *another* full-month supply of Duragesic patches, this time in the 25 mcg/hr strength. (Count 4) Dr. McDuff claims this March 17, 2016 prescription was written within the usual course of professional practice and for a legitimate medical purpose. Furthermore, Dr. McDuff claims:

> Mr. Roberts purportedly was not receiving adequate pain relief from the use of the previously prescribed March 14, 2016 50 mcg Fentanyl Duragesic patch, so Dr. Snellgrove prescribed an additional 25 mcg Fentanyl Duragesic patch to be worn by Mr. Roberts at the same time as the 50 mcg patch. This would provide Mr. Roberts with the equivalency of a 75 mcg patch dosage for additional pain relief.

The problem with this statement is that it is unsupported by Dr. Snellgrove's medical records for Matthew Roberts. Not only is there no office visit document for March 17, 2016, but

no office visit was billed to Roberts' insurance for this date. Furthermore, there is no documentation *at all* concerning why Dr. Snellgrove chose to prescribe a second full-month supply of Duragesic patches three days after writing the first prescription. Since this information is not in the medical record, it appears likely to have come to Dr. McDuff directly from Dr. Snellgrove. Dr. Snellgrove can certainly testify about his rationale for writing this second, undocumented Duragesic prescription, but he cannot circumvent testifying by having Dr. McDuff testify about Dr. Snellgrove's thought process.

Dr. McDuff's next opinion concerns the April 14, 2016 prescription for a full-month supply of 50 mcg/hr Duragesic patches. (Count 7) Notably, Dr. McDuff provided no opinion on the *third* full-month prescription for Duragesic patches written for Roberts in March 2016, which was prescribed in Roberts' cousin's name. (Count 5) Dr. McDuff's opinion with regard to the April 14, 2016 prescription is merely conclusory. Here is the entirety of that opinion:

> Mr. Roberts obtained a refill of Fentanyl Duragesic approximately one month later, on April 14, 2016. Dr. Snellgrove then prescribed 50 mcg Fentanyl Duragesic patches which present a 30 day supply. This prescription was well within the usual course of professional medical practice and for a legitimate medical purpose.

However, as was the case above, none of this conclusory information comes from the medical records. There is no medical record of a patient visit for Roberts on this date, nor any associated insurance billing. Furthermore, there is nothing to explain why the prescription went from a combined 75 mcg/hr to 50 mcg/hr. This again appears to be Dr. Snellgrove's attempt to get his thought process before the jury through Dr. McDuff so as to circumvent the need to testify.

Dr. McDuff does not mention the second full-month supply of Duragesic patches Dr. Snellgrove wrote four days later on April 18, 2016. (Count 8) This prescription for a full month of 50 mcg/hr patches was written in someone else's name for Roberts.

With regard to the July 12, 2016 prescription for a full-month supply of 50 mcg/hr Duragesic patches, Dr. McDuff highlights the findings noted in the medical records from the office

10

visit and opines that this prescription was within the usual course of professional practice and for a legitimate medical purpose. (Count 10) Eight days later, Dr. Snellgrove prescribed another full-month supply of Duragesic patches to Roberts, this time in the 75 mcg/hr strength. (Count 11) With regard to this second full-month prescription, Dr. McDuff opines that:

> Dr. Snellgrove purportedly communicated with Mr. Roberts informally and Roberts was complaining of increasing pain from playing the guitar, and Dr. Snellgrove increased the dosage from 50 mcg to 75 mcg of Fentanyl Duragesic because of this increasing pain.

Once again, there is *nothing* in the medical record to support this assertion. There is no medical entry for July 20, 2016, and the medical records are silent not only as to why the second prescription for 75 mcg/hr patches was written, but also as to the existence of this second full-month prescription at all.

Finally, Dr. McDuff opines on the two final prescriptions for Duragesic patches, both written on August 18, 2016. (Counts 12 and 13) Dr. McDuff states, almost verbatim, the explanation in the medical record for the August 18, 2016 patient visit:

> "[W]ork in the studio was going well, and he and Dr. Snellgrove discussed dropping the Fenantyl Duragesic patch down to 50 mcg. Dr. Snellgrove prescribed a 50 mcg dosage of Fentanyl Duragesic patches but the pharmacy did not have a supply of those patches, so Dr. Snellgrove elected to allow Mr. Roberts to remain on the previously prescribed 75 mcg Fentanyl Duragesic patches.

Notably, Dr. McDuff does not offer an opinion as to whether increasing the strength of a prescription by fifty percent merely because one pharmacy does not have the original strength in stock is within the usual course of professional practice. Since he has not provided an opinion with regard to these final two Duragesic prescriptions as part of his Rule 16 disclosures, he should be precluded from offering an opinion on these Counts at trial.

### B.     Mr. H. Chip Walls — Forensic Toxicologist

Mr. Walls is a non-Ph. D. forensic toxicologist who has been retained by defense counsel to opine on the post-mortem toxicology performed on Matthew Roberts' body fluids. Based on the summary provided by the defense, Mr. Walls intends to critique the toxicology work performed by Dr. Christopher Long at the St. Louis University Toxicology Laboratory. In addition, Mr. Walls intends to testify about post-mortem redistribution of fentanyl. Mr. Walls certainly has the requisite expertise to testify about these topics. However, Mr. Walls has not presented any supporting authority for his criticism of how the toxicology work was done at the St. Louis University Toxicology Laboratory. If he cannot produce supporting authority for these criticisms, he should not be allowed to make these criticisms under the auspice of an "expert opinion."

Finally, despite a lengthy summary Mr. Walls does not appear to have reached an actual opinion regarding the toxicology results. In light of his failure to properly disclose what, if any, ultimate opinion he has formed regarding the toxicology in this case, Mr. Walls should be precluded from offering such opinion at trial.

### C.     Dr. James Lauridson, M.D. — Forensic Pathologist

Dr. Lauridson is a retired forensic pathologist who has been retained by defense counsel to opine on cause of death. Dr. Lauridson acknowledges that the death investigate was "thorough and detailed," the autopsy report was "likewise detailed and well documented," and the "toxicology report is clearly well written." Furthermore, he agrees with the medical examiner who signed the death certificate that the cause of death was "multiple medication intoxication (fentanyl, hydrocodone, and alprazolam)." However, Dr. Lauridson disagrees with the opinion of the United States' experts that the fentanyl was the "but for" cause of Roberts' death. Rather, he intends to opine that it cannot be determined which of the drugs in Roberts' system at the time of death was the "but for" cause of death.

In general, this is an appropriate type of opinion to offer based on Dr. Lauridson's expertise. The one potential issue the United States foresees with his testimony is that Dr. Lauridson may attempt to instruct the jury on the law regarding the legal standard it must meet to find that the fentanyl prescribed by Dr. Snellgrove was the cause of Roberts' death. Instructions on the law must come from the Court, not an expert forensic pathologist. *See Montgomery.*, 898 F.2d at 1541.

The United States reserves the right to make other objections to Dr. Lauridson opinion testimony when it is presented in trial.

## CONCLUSION

For the reasons set out herein, the United States requests the Court hold a *Daubert* hearing to evaluate whether Dr. James McDuff possesses the requisite expertise to offer his proposed opinion testimony. In addition, the United States requests the Court preclude Dr. Lauridson, Mr. Walls, and Dr. McDuff (if he qualifies as an expert) from offering certain opinion testimony discussed herein.

Respectfully submitted this 6th day of February, 2018.

RICHARD W. MOORE
UNITED STATES ATTORNEY
by:

By: */s/Christopher J. Bodnar*
Christopher J. Bodnar
Assistant United States Attorney
63 South Royal Street, Suite 600
Mobile, Alabama 36602
(251) 441–5845
christopher.bodnar@usdoj.gov

By: */s/ Deborah A. Griffin*
Deborah A. Griffin
Assistant United States Attorney
63 South Royal Street, Suite 600
Mobile, Alabama 36602
(251) 441–5845
deborah.griffin@usdoj.gov